# COMPLAINT
# Santa Barbara County Superior Court
# Case No. 21CV03511

# Exhibit A

1  Robert M. Cohen  (SBN 40134)
   bob@bobcohenesq.com
2  **LAW OFFICES OF ROBERT M. COHEN**
   301 N. Canon Drive, Suite 300
3  Beverly Hills CA 90210
   Telephone: (310) 277-1127
4

5  Jason E. Luckasevic (PA State Bar 85557)
   jluckasevic@gpwlaw.com
6  **GOLDBERG, PERSKY & WHITE, P.C.**
   11 Stanwix Street, Suite 1800
7  Pittsburgh, PA  15222
   Telephone:  412-471-3980
8  Fascimile:  412-471-8308
   *(Pro Hace Vice forthcoming)*
9
   William T. Gibbs (IL State Bar 6282949)
10 WTG@corboydemetrio.com
   **CORBOY & DEMETRIO**
11 33 North Dearborn Street, 21ˢᵗ Floor
   Chicago, IL  60602
12 Telephone:  312-346-3191
   *(Pro Hace Vice forthcoming)*
13

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
9/1/2021 3:10 PM
By: Elizabeth Spann, Deputy

14

15              SUPERIOR COURT OF THE STATE OF CALIFORNIA
                     COUNTY OF SANTA BARBARA

16 KATHRYN ZIMMIE,                     )   Case No:  21CV03511
                                       )
17                                     )
                                       )   COMPLAINT FOR DAMAGES
18      Plaintiff,                      )   1.   Breach of Express
                                       )        Contract
19                                     )   2.   Breach of Implied
                                       )        Contract
20                                     )
21      vs.                            )   3.   Quiet Title
                                       )   4.   Intentional Infliction of
22 H. TY WARNER,                       )        Emotional Distress
                                       )   5.   Negligent Infliction of
23      Defendant.                     )        Emotional Distress
                                       )   6.   Conversion
24                                     )   7.   Fraud/Civil RICO
                                       )
25

26

27

28

---

1
COMPLAINT

Plaintiff, KATHRYN ZIMMIE ("ZIMMIE") submits the within Complaint for causes of action against Defendant H. TY WARNER ("WARNER") and pleads and sets forth and alleges as follows:

### FIRST CAUSE OF ACTION
(Damages Based Upon Breach of Express Contract)

1. Plaintiff, ZIMMIE, is domiciled in the State of California, County of Los Angeles, at the time of the filing of the instant action.

2. Defendant, WARNER, is domiciled in the State of California, County of Santa Barbara, at the time of the filing of the instant action.   More specifically, WARNER has been living at his residence in Santa Barbara continuously and consecutively since late 2019.

3. ZIMMIE and WARNER first met in 1977 and began an off and on personal relationship that continued through the mid-1980s.  During this period of time, WARNER was fired from Dakin and was experiencing significant financial difficulties.   He relied on ZIMMIE for financial support – she provided him significant support (i.e., in excess of one hundred thousand dollars).  Additionally, WARNER relied upon ZIMMIE for usage of her automobile for his own personal use. It was this support, assistance and generosity by ZIMMIE that helped WARNER launch his billion-dollar bean bag toy business, "Ty, Inc."

4. After WARNER launched Ty, Inc., ZIMMIE and WARNER rekindled their personal relationship in the late 1990s.  WARNER and ZIMMIE's close personal relationship lasted through November 2020.

5. The personal relationship between ZIMMIE and WARNER was serious and significant – in addition, in the early 2000s, WARNER and ZIMMIE agreed that ZIMMIE would assist WARNER with his business affairs.

6. Around 2001, WARNER started construction on his dream home (now likely worth more than $400 million dollars) in Montecito, California located at 1000 Channel Drive, Santa Barbara, CA 93108. WARNER and ZIMMIE cohabitated in this home, beginning in 2010 upon completion of the construction. They were domiciled there, together, until November 2020. The aforementioned home included a bedroom built and designed for ZIMMIE's granddaughter and an art studio made exclusively for ZIMMIE.

7. The above-referenced property was purchased by WARNER for which he expressly stated and represented to ZIMMIE that the aforementioned property was their home together.

8. In 2006, the parties entered into an oral agreement involving various mutual promises including but not limited to:

    a. WARNER promised ZIMMIE that he would always provide for her and financially support her. Specifically, WARNER promised, on numerous occasions, that he "would always take care of her (ZIMMIE)" in consideration of ZIMMIE providing companionship to WARNER, supporting him emotionally in both his personal and professional life, and acting as his confidante, helpmate, and partner;

    b. ZIMMIE agreed to devote her time and attention to WARNER's personal and business needs and fostered and perpetuated their relationship in consideration of WARNER's continued and repeated assurances that she would always be financially secure;

    c. WARNER promised ZIMMIE throughout the course of the parties' relationship that she and WARNER were equal partners in their mutual endeavors and that she would always be financially secure in

exchange for giving up her own career opportunities and
advancements.

9.  In furtherance of these agreements, WARNER expressed his

desired to marry ZIMMIE and desired a pre-nuptial agreement.  The proposed
agreement, that was never executed, promised to take care of ZIMMIE fairly and
forever.

10. WARNER formally proposed and promised marriage to ZIMMIE on

dozens of occasions beginning around 2002.  WARNER wrote his promise of
marriage on a note that ZIMMIE kept in her possession until later she found that it
was stolen and destroyed by WARNER.  Furthermore, WARNER discussed various
elaborate wedding plans with ZIMMIE to occur in Las Ventantas, Mexico and/or
Santa Barbara, California.  In furtherance of this action, WARNER held himself out
to the public as married by telling people that he was married to ZIMMIE and by also
wearing a wedding ring, beginning by 2005.  ZIMMIE also wore a wedding ring and
they held themselves out to the public as married.  In 2010, WARNER in fact provided
ZIMMIE with an engagement ring.  WARNER additionally asked that he be named
the beneficiary of ZIMMIE's Last Will and Testament.

11. Pursuant to and in confirmation of and in reliance upon the said

agreement, WARNER and ZIMMIE maintained a "marriage-like" relationship from
approximately 2000 to 2020.

12. Throughout this time, ZIMMIE and WARNER created a familial

relationship and treated each other's family as their own.  For example, WARNER
purchased a home for ZIMMIE's daughter.  WARNER also took ZIMMIE's daughter
and granddaughter with them on vacations to Mexico, Connecticut and Disneyworld.

WARNER often drove ZIMMIE's daughter to school and, in fact, taught ZIMMIE's daughter how to drive.

13. During the parties' relationship, WARNER and ZIMMIE enjoyed an elaborate standard of living travelling domestically and internationally to destinations around the globe including Asia, Chicago, Germany, Morocco, Europe, Italy, England, California, New York. It was during the period of time of their relationship from 1998 to 2020 that WARNER started and grew his property business with acquisitions of the Four Seasons Biltmore, the Four Seasons in New York, San Ysidro Rancho, Las Ventanas al Paraiso, Sandpiper Golf Course, Coral Casino in Santa Barbara, Montecito Country Club. In fact, WARNER made the San Ysidro Ranch redecoration ZIMMIE's project - for which she received two prestigious awards for its décor.

14. Throughout the parties' relationship, the agreement between WARNER and ZIMMIE was reaffirmed and ratified by the parities both verbally and by their conduct.

15. Pursuant to WARNER's promise to ZIMMIE, WARNER did in fact pay for all of their living expenses. WARNER paid for all of ZIMMIE's expenses and needs until she left him in November 2020 due to fear for her safety and well-being.

16. In reliance on WARNER's promises that she would always be taken care of, ZIMMIE devoted every hour of her life for seven days per week, for decades, fostering her relationship with WARNER and supporting WARNER, both professionally and personally. She travelled the world with him, attending trade shows and conferences, accompanying WARNER on business trips and inspections of manufacturing plants, creating designs for his companies, decorating his San Ysidro Ranch on two separate occasions, decorating other of WARNER's hotels,

creating artwork for WARNER's businesses, creating artwork for WARNER's personal use, decorating their aforementioned home in Montecito, creating advertisements for his properties, and designing menus at his restaurants.

17. Throughout the parties' relationship, in further reliance on WARNER's promises, ZIMMIE passed up various career opportunities that would have benefitted her and provided financial stability. Instead, ZIMMIE spent seven days a week working and living with WARNER. In turn, WARNER always promised to financially provide for her for the rest of her life.

18. ZIMMIE has at all times performed each and every covenant and condition to be performed by her for the benefit of the parties.

19. During the time ZIMMIE and WARNER maintained their relationship, WARNER acquired substantial personal, business and real property holdings as discussed above.

20. The above referenced services that ZIMMIE performed for WARNER and the contribution of ZIMMIE's skills, expertise, efforts and labor - pursuant to the terms of said agreement - were mutually bargained for by the parties and are adequate consideration for the providing to ZIMMIE of promised interests in financial, personal, real property and other business interests, to render ZIMMIE financially secure and that said agreement was and is just, fair, reasonable and equitable in all respects.

21. WARNER has failed to honor his promises to ZIMMIE. Counsel for ZIMMIE reached out to counsel for WARNER to discuss a resolution of the anticipated legal claims in January 2021. In response, Counsel for ZIMMIE was notified by counsel for WARNER that he demanded the return of her mobile devices,

computers, tablets and the like that he allegedly purchased.  He also advised that he was cancelling a supposed "contract" with an alleged entity that he created and referred to as ZIMMIE's business which was apparently being paid $200,000 annually since 2018.  ZIMMIE returned the items but to this day is unaware of any business nor did she personally receive any compensation from WARNER.  Rather, she is now left, at age eighty-five (85) with debt on a credit card and an overdue tax bill.

22. By reason of the refusal by WARNER to honor said oral agreement as set forth herein above, WARNER has breached said agreement.

23. As a proximate cause of said breach of contract, ZIMMIE has been damaged in an amount in excess of the jurisdictional limits of this Court.

24. WARNER should be further estopped to raise any section of the Statute of Frauds as his actions and representations caused ZIMMIE to detrimentally rely on their agreement and that WARNER, in turn, would be unconscionably and unjustly enriched.

## SECOND CAUSE OF ACTION

(For Damages Based on Breach of Implied in Fact Contract)

25. Plaintiff incorporates paragraphs 1 through 24, inclusive of this Complaint as though fully set forth herein.

26. During the entirety of their relationships, as part of an implied agreement with WARNER at said time and continuing thereafter, ZIMMIE gave up her goals and career opportunities which would have benefitted her.  As part of said implied agreement, ZIMMIE devoted her skills, efforts, expertise and labor in furtherance of

the agreement entered into between the parties and in maintaining ZIMMIE and WARNER's relationship wherein ZIMMIE acted as WARNER's companion, protector, confidante, and helpmate thereby satisfying all of WARNER's personal needs.

27. WARNER understood that ZIMMIE was contributing her skills, efforts, expertise and labor to WARNER and that WARNER would treat ZIMMIE fairly for the rest of her life.

28. WARNER manifested his assent to the conditions on which ZIMMIE performed, expended and contributed her skills, efforts, expertise and labor as herein described, by accepting her skills, efforts, expertise and labor and treating her skills, efforts, expertise and labor as property of both ZIMMIE and WARNER.

29. During the course of time that ZIMMIE and WARNER maintained their relationship, said parties conducted their relationship in a manner and with similar force and effect as would a married couple and in doing so, dealt with each other in a fair and trusting manner, thereby creating in both ZIMMIE and WARNER a reasonable expectation between the parties as follows:

      a.  At WARNER's request, ZIMMIE gave up various goals and opportunities which would have benefitted her in the future so that she would be able to devote all of her time and attention to WARNER's personal and professional needs, with the continued assurance that she would then and in the future, in the case of the termination of their relationship, obtain a fair and equitable division of the parties' assets and that she would be rendered financially secure for the remainder of her life;

b. ZIMMIE acted as a partner, companion, protector, helpmate and confidante to WARNER;

c. ZIMMIE devoted most aspects of her life to WARNER's needs, interests and well being to the exclusion of her own, making herself available to WARNER at all times;

d. Throughout the period of time the parties' maintained their relationship, WARNER assured ZIMMIE that she would always be taken care of and would be rendered financially secure; and

e. ZIMMIE enjoyed and maintained, during the course of the parties' relationship, a certain standard of living, which standard of living WARNER promised to maintain or exceed for ZIMMIE.

30. ZIMMIE devoted her time and attention to WARNER's personal needs with continued assurance during the course of the parties' relationship that she would be rendered financially secure.

31. In November 2020, ZIMMIE left WARNER for fear of her safety and well being.  In January of 2021, WARNER breached the agreement by refusing to resolve this dispute and then cutting off all benefits to ZIMMIE.  WARNER remains in breach of the agreement existing between the parties.

32. ZIMMIE has at all times performed each and every covenant and condition by her to be performed and rendered services and contributing her skills, efforts, expertise and labor as required by the terms of the agreement between the parties.

33. The above referenced services that ZIMMIE performed for WARNER and the contribution of ZIMMIE's skills, efforts and labor under and pursuant to said agreement, were, and are, adequate consideration for the providing of the promised



9
COMPLAINT

division of real and personal property holdings upon separation and the rendering of ZIMMIE as financially secure.  Said agreement was and is fair, reasonable and equitable in all respects.

34. As a proximate cause of said breach of the implied in fact contract, ZIMMIE has been damaged in an amount in excess of the jurisdictional limits of this Court.

## THIRD CAUSE OF ACTION

(Quiet Title)

35. Plaintiff incorporates Paragraph 1 through 34, inclusive of this Complaint as though fully set forth herein.

36. ZIMMIE, at all times herein mentioned, was the owner of an undivided one-half interest in the property located at 1000 Channel Drive, Santa Barbara, CA 93108.

37. ZIMMIE, at all times herein mentioned, was, and is, entitled to possession and control of the above-described real property.

38. The basis of ZIMMIE's claim to title is that during the course of their relationships, ZIMMIE and WARNER entered into an oral and implied in fact agreement wherein ZIMMIE agreed to act as WARNER's companion, protector, confidante, advisor and helpmate.  In exchange, WARNER promised to render ZIMMIE financially secure for the rest of her life.

39. Beginning around 2000, WARNER purchased the 1000 Channel Drive, Santa Barbara, CA 93108 property for both himself and ZIMMIE.  From thereon after, the parties considered themselves to be equal owners of the aforementioned property,

regardless of how title was held.  To wit, there was an entire wing designed for, and used exclusively by, ZIMMIE as her art studio.  All her paints, supplies, and a few pieces she was working on remain there to this day, along with her clothes and personal belongings.  Further, ZIMMIE and WARNER travelled the world together, gathering unique and expensive artwork for the home.  ZIMMIE furnished and decorated the home.

40. ZIMMIE is informed and believes and thereon alleges that WARNER claims an interest in the above described real property adverse to ZIMMIE's.

41. ZIMMIE is seeking to quiet title against the claim of WARNER as follows:

    a.  ZIMMIE and WARNER entered into an agreement wherein ZIMMIE agreed to act as WARNER's companion, confidante and act as helpmate and partner and that she would support him emotionally in both his personal and professional life.  WARNER promised to ZIMMIE that he would always provide for her and financially support ZIMMIE for the rest of her life; and

    b.  As a result of the parties' aforementioned agreement, ZIMMIE and WARNER each have an undivided one half ownership interest in the aforementioned property.

42. ZIMMIE seeks to quiet title the aforementioned property as of WARNER's date of purchase of the property.

### FOURTH CAUSE OF ACTION

(Intentional Infliction of Emotional Distress)

43. Plaintiff incorporates Paragraph 1 through 42, inclusive of this Complaint as though fully set forth herein.



44. In 2012, at a bathroom in the Four Seasons New York hotel owned by WARNER, ZIMMIE announced that she was leaving WARNER.  WARNER placed his hand around ZIMMIE's throat and stated "I wouldn't do that if I were you." WARNER had squeezed ZIMMIE's throat so hard that she realized that her life was in in danger if she ever left him.

45. Continuing after the date of this incident, WARNER's continued controlling conduct caused her to suffer severe emotional distress.  For example, on one occasion, ZIMMIE had an ankle injury which caused her to be unstable on her feet and eventually led to her requiring the use of a cane to assist with her mobility. WARNER would constantly berate her, in public, need to require a cane or need assistance stating the "ground was flat" and "You're fine."   The verbal and demonstrable abuse became more outrageous in 2019 and 2020 when WARNER would physically hide ZIMMIE's cane so that she would not use it.  When ZIMMIE could not locate the cane, she would hold onto things to keep her stable around their Montecito home and WARNER would exclaim to her "why are you hanging onto things?  You look ridiculous."

46. WARNER's conduct was continually verbally and emotionally abusive over the course of their relationship.  She was never allowed to leave his side for the last 20 years.  When she would leave the room they were in together, WARNER would immediately start yelling for her "Katie, Katie, Katie!"   WARNER, by example, would often be rude and loud when ZIMMIE did not finish a meal stating to ZIMMIE "why can't you finish that!  It costs money!"  Even if she coughed, WARNER would tell her that he was irritated and would yell at ZIMMIE to "go to the hospital as I can't stand that coughing!"

47. When ZIMMIE tried to leave the first time in November of 2020

WARNER saw her suitcases by the door and stated "nobody is going anywhere." ZIMMIE retreated to her room and WARNER accused her of "upsetting everyone like that."

48. ZIMMIE was watched 24/7 by WARNER with the cameras everywhere in their homes and businesses. ZIMMIE was fearful of her well being and confided in a friend to keep searching for her if she ever turned up missing.

49. WARNER's statements and actions intended to cause ZIMMIE's emotional distress and WARNER acted with reckless disregard that his actions would cause ZIMMIE emotional distress.

50. ZIMMIE did in fact suffer severe emotional distress.

51. WARNER's conduct was a substantial factor in causing ZIMMIE's severe emotional distress and as a result she has been damaged in an amount in excess of the jurisdictional limits of this Court.

## FIFTH CAUSE OF ACTION

(Negligent Infliction of Emotional Distress)

52. Plaintiff incorporates Paragraph 1 through 51, inclusive of this Complaint as though fully set forth herein.

53. WARNER owed a duty of care at all times to ZIMMIE during the course of their agreement and relationship.

54. WARNER negligent acted and breached that duty of care to ZIMMIE in 2012 at a bathroom in the Four Seasons New York hotel owned by WARNER, ZIMMIE announced that was leaving WARNER after another one of his broken promises. WARNER then proceeded to put his hands around ZIMMIE's throat and

stated "I wouldn't do that if I were you." He had squeezed her throat so hard that she realized that her life was in in danger if she ever left her.

55. Continuing after the date of this incident, ZIMMIE claims that WARNER's continued conduct caused her to suffer severe emotional distress.

56. ZIMMIE had an ankle injury which caused her to be unstable on her feet and eventually led to her requiring the use of a cane to assist with her mobility. WARNER would constantly berate her need to require a cane or need assistance stating the "ground was flat" and "You're fine." The verbal and demonstrable abuse became more outrageous in 2019 and 2020 when WARNER would physically hide ZIMMIE's cane so that she would not use it. When ZIMMIE could not locate the cane, she would hold onto things to keep her stable around their Montecito home and WARNER would exclaim to her "why are you hanging onto things? You look ridiculous."

57. WARNER's conduct was continually verbally abusive over the course of their relationship. She was never allowed to leave his side for the last 20 years. When she would leave the room they were in together, WARNER would immediately start yelling for her "Katie, Katie, Katie!"

58. When ZIMMIE tried to leave the first time in November of 2020, WARNER saw her suitcases by the door and stated "nobody is going anywhere." ZIMMIE retreated to her room and WARNER accused her of "upsetting everyone like that."

59. ZIMMIE was watched 24/7 by WARNER with the cameras everywhere in their homes and businesses. ZIMMIE was fearful of her well being and confided in a friend to keep searching for her if she ever turned up missing.

60. WARNER, by example, would often be rude and loud when ZIMMIE did

not finish a meal stating to ZIMMIE "why can't you finish that!  It costs money!"

61. Even if she coughed, WARNER would tell her that he was irritated and would yell at ZIMMIE to "go to the hospital as I can't stand that coughing!"

62. WARNER overt statements intended to cause ZIMMIE's emotional distress and WARNER acted with reckless disregard that his actions would cause ZIMMIE emotional distress.

63. ZIMMIE did in fact suffer severe emotional distress.  This is proven by the fact that she fled fearing for her well being in November 2020.

64. WARNER's negligence was a substantial factor in causing ZIMMIE's serious emotional distress.

65. ZIMMIE has been harmed in that she suffers from anguish, fright, horror, anxiety, nervousness, worry and shame and has been damaged in an amount in excess of the jurisdictional limits of this Court.

## SIXTH CAUSE OF ACTION

(Conversion)

66. Plaintiff incorporates Paragraph 1 through 65, inclusive of this Complaint as though fully set forth herein.

67. ZIMMIE is an accomplished artist and has created many pieces of artwork.  WARNER loved her paintings and took them from her to decorate their Montecito home and his many properties and businesses.

68. ZIMMIE believed that WARNER's intentions were to create a trusting

and loving relationship for which ZIMMIE would continue to be taken care of for the rest of her life as was promised by WARNER.

69. The paintings range from two foot by four foot to five foot by six foot and are mixed media on canvas and are best described as abstract expressionistic similar to those of artist Helen Frankenthaler.

70. Two large original paintings are in WARNER's personal office at Ty, Inc.

71. Twenty-six original paintings are in the aforementioned home in Santa Barbara.

72. Seven original paintings are in the New York Four Seasons hotel.

73. Twenty reproductions are in the Montecito Country Club.

74. Two original paintings are in the Biltmore Santa Barbara hotel.

75. Additionally, WARNER continues to use ZIMMIE's drawings for advertisements in the Montecito Journal for the San Ysidro Ranch.

76. Further, ZIMMIE created designs and logos for many Beanie Baby paraphernalia sold by WARNER.

77. Moreover, ZIMMIE redrew approximately 150 Beanie Baby designs, for use that was licensed by WARNER and sold in various types of products including T-shirts, children's clothing and towels to name a few of the items.

78. WARNER substantially interfered with ZIMMIE's artwork by knowingly or intentionally refusing to return the artwork to ZIMMIE despite her requests to return the same.

79. ZIMMIE did not consent to the taking of the artwork after their relationship ended.

80. ZIMMIE has suffered harm by the loss of value of the artwork while WARNER continues to profit from the same at his properties.

81. WARNER's conduct was a substantial factor in causing ZIMMIE's harm for which she has suffered damages in excess of the jurisdictional limits of this Court.

## SEVENTH CAUSE OF ACTION
### (FRAUD/CIVIL RICO)

82. Plaintiff incorporates Paragraph 1 through 81, inclusive of this Complaint as though fully set forth herein.

83. Mr. WARNER and individuals who assisted him in his financial affairs, comprised an enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4), that is, the Enterprise constituted a group of individuals associated in fact that were engaged in, and the activities of which affected, interstate commerce.

84. The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

85. The purposes of the Enterprise were to provide tax benefits to Mr. WARNER, to deceive and defraud Ms. ZIMMIE, and to perpetuate WARNER's relationship with ZIMMIE by convincing her that she was properly compensated and that she would always be financially secure.

86. The members of the Enterprise expected to receive financial opportunities and personal benefits, including increased power and status within the Enterprise.

87. In connection with the Enterprise, WARNER and other members of the

Enterprise misappropriated ZIMMIE's identity to create a fictitious legal entity that ZIMMIE knew nothing about.  WARNER funneled funds through this fictitious entity to deceive ZIMMIE and others.

88. The Enterprise operated within the State of California and elsewhere.

89.  ZIMMIE brings this private civil claim pursuant to 18 U.S.C. Section 1964 against WARNER as she has been injured as a direct and proximate result of defendants' activities and violations of 18 U.S.C. § 1962.

90. On or about January 2018, WARNER created a company using the name of ZIMMIE and named it Cleveland Design Consultants, LLC, without her knowledge.

91. Upon information and belief, WARNER, and those associated with him, funneled money into and through Cleveland Design Consultants, LLC – wiring funds into the account on numerous occasions.

92. Without Zimmie's knowledge, these funds would then be transferred from the LLC account into other accounts at WARNER's direction.

93. WARNER is a convicted felon.  In 2014, he was convicted of tax evasion for creating a secret offshore account.

94. WARNER's, and his enterprise's, activities and violations of 18 U.S.C. § 1962 constitute a pattern of deceit carried out over a number of years.  Specifically, WARNER wired funds to the Cleveland Design Consultants, LLC perpetually from 2018 to 2020 on well more than 50 occasions.

95. Specifically, the Cleveland Design Consultants, LLC was created using

ZIMMIE's name by the direction of WARNER to funnel funds without her knowledge into a corporation that he operated, directed and controlled without ZIMMIE's knowledge.

96. ZIMMIE suffered harm through sustaining identity theft and wire fraud for which she was recently informed by the Delaware Secretary of State that she is delinquent on paying of overdue taxes on the Cleveland Design Consultants, LLC business.

97. WARNER's conduct was a substantial factor in causing ZIMMIE's harm including her identity theft and failure to be compensated per an alleged contract which WARNER alleges exists for which she has suffered damages in excess of the jurisdictional limits of this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, ZIMMIE prays for judgment as follows:

(1) For damages according to proof at the time of trial, including, but not limited to compensatory damages, damages related to WARNER's unjust enrichment, and punitive damages.

(2) For costs of suit incurred herein, to the extent permitted by law.

(3) For quiet title to an interest in real property, and judgment ordering that ZIMMIE owns an undivided one half interest in the property located at 1000 Channel Drive, Santa Barbara, CA 93108.

(4) To enjoin WARNER from utilizing ZIMMIE's paintings, drawings and intellectual property and to return all of ZIMMIE's artwork to ZIMMIE.

(5) To send this matter to the appropriate authorities for a criminal investigation of WARNER.

1    (6) For such other and further relief as the Court may deem just and

2          proper.

3

4

5    DATED:  September 1st, 2021          Respectfully submitted,

6                                                          LAW OFFICES OF ROBERT M. COHEN

7                                                          By: _____

8

9                                                          ROBERT M. COHEN,

10                                                        Attorneys for Plaintiff, Kathryn Zimmie

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28