1   Robert M. Cohen  (SBN 40134)
    bob@bobcohenesq.com
2   **LAW OFFICES OF ROBERT COHEN**
    301 N. Canon Drive, Suite 300
3   Beverly Hills CA 90210
    Telephone: (310) 277-1127
4

5   Jason E. Luckasevic (PA State Bar 85557)
    jluckasevic@gpwlaw.com
6   **GOLDBERG, PERSKY & WHITE, P.C.**
    11 Stanwix Street, Suite 1800
7   Pittsburgh, PA  15222
    Telephone:  412-471-3980
8   Facsimile:  412-471-8308
    *(Admitted via Pro Hac Vice)*
9

    William T. Gibbs (IL State Bar 6282949)
10  WTG@corboydemetrio.com
    **CORBOY & DEMETRIO**
11  33 North Dearborn Street, 21st Floor
    Chicago, IL  60602
12  Telephone:  312-346-3191
    *(Admitted via Pro Hac Vice)*

13

14      UNITED STATE DISTRICT COURT – CENTRAL DISTRICT OF CALIFORNIA
15                              WESTERN DIVISION

16  KATHRYN ZIMMIE,                      )   Case No: 2:21-cv-07853-AFM
17                                       )   PLAINTIFF'S SECOND
                                         )   AMENDED COMPLAINT  AT LAW
18          Plaintiff,                   )   1.    Breach of Express
19                                       )         Contract
                                         )   2.    Breach of Implied
20                                       )         Contract
21      vs.                              )   3.    Quiet Title
                                         )   4.    Intentional Infliction of
22  H. TY WARNER, and FAIRWAY            )         Emotional Distress
23  BB PROPERTY, LLC                     )
                                         )   5.    Negligent Infliction of
24          Defendant.                   )         Emotional Distress
25                                       )   6.    Conversion
                                         )   7.    Fraud/Civil RICO
26

27                                           Plaintiff Demands Trial by Jury

28

                                    1
                        SECOND AMENDED COMPLAINT

## SECOND AMENDED COMPLAINT AT LAW

Plaintiff, KATHRYN ZIMMIE ("ZIMMIE") submits the within SECOND AMENDED COMPLAINT for causes of action against Defendant H. TY WARNER ("WARNER"), and Defendant FAIRWAY BB PROPERTY, LLC ("FAIRWAY") and pleads and sets forth and alleges as follows:

## FIRST CAUSE OF ACTION
(Damages Based Upon Breach of Express Contract)

1.  Plaintiff, ZIMMIE, is domiciled in the State of California, County of Los Angeles, at the time of the filing of the instant action.

2.  Defendant, WARNER, per his own affirmation is domiciled in the State of California.  He has been living consecutively in California, County of Santa Barbara, at the time of the filing of the instant action for nearly two straight years at the property in question and a substantial part of the events in question involving the matters of this Complaint occurred in California.

3.  Defendant, FAIRWAY, is a Delaware Limited Liability Corporation which owns and holds title to property at issue in this dispute located at 1000 Channel Drive, Santa Barbara, CA 93108.

4.  ZIMMIE and WARNER first met in 1977 and began an off and on personal relationship that continued through the mid-1980s.  During this period of time, WARNER was fired from Dakin and was experiencing significant financial difficulties.  He relied on ZIMMIE for financial support – she provided him significant support (i.e., in excess of one hundred thousand dollars).  Additionally, WARNER relied upon ZIMMIE for usage of her automobile for his own personal use.  It was this support, assistance and generosity by ZIMMIE that helped WARNER launch his billion-dollar bean bag toy business, "Ty, Inc."

5.  After WARNER launched Ty, Inc., ZIMMIE and WARNER rekindled

their personal relationship in the late 1990s.  WARNER and ZIMMIE's close personal relationship lasted through November 2020.

6.      The personal relationship between ZIMMIE and WARNER was serious and significant – in addition, in the early 2000s, WARNER and ZIMMIE agreed that ZIMMIE would assist WARNER with his business affairs.

7.      Around 2001, WARNER started construction on his dream home (now likely worth more than $400 million dollars) in Montecito, California located at 1000 Channel Drive, Santa Barbara, CA 93108.  WARNER and ZIMMIE cohabitated in this home, beginning in 2010 upon completion of the construction.   They were domiciled there, together, until November 2020.  The aforementioned home included a bedroom built and designed for ZIMMIE's granddaughter and an art studio made exclusively for ZIMMIE.

8.      In 2006, the parties entered into an oral agreement involving various mutual promises including but not limited to:

      a. WARNER promised ZIMMIE that he would always provide for her and financially support her.  Specifically, WARNER promised, on numerous occasions, that he "would always take care of her (ZIMMIE)" in consideration of ZIMMIE providing companionship to WARNER, supporting him emotionally in both his personal and professional life, and acting as his confidante, helpmate, and partner;

      b. ZIMMIE agreed to devote her time and attention to WARNER's personal and business needs and fostered and perpetuated their relationship in consideration of WARNER's continued and repeated assurances that she would always be financially secure;

      c. WARNER promised ZIMMIE throughout the course of the parties' relationship that she and WARNER were equal partners in their mutual endeavors and that she would always be financially secure in

1   exchange for giving up her own career opportunities and
2   advancements.

3   9.   In furtherance of these agreements, WARNER expressed his desire to
4   marry ZIMMIE and desired a pre-nuptial agreement. The proposed agreement, which
5   was never executed, promised to take care of ZIMMIE fairly and forever.

6   10.   WARNER formally proposed and promised marriage to ZIMMIE on
7   dozens of occasions beginning around 2002. WARNER wrote his promise of
8   marriage on a note that ZIMMIE kept in her possession until later she found that it
9   was stolen and destroyed by WARNER. Furthermore, WARNER discussed various
10   elaborate wedding plans with ZIMMIE to occur in Las Ventanas, Mexico and/or
11   Santa Barbara, California. In furtherance of this action, WARNER held himself out
12   to the public as married by telling people that he was married to ZIMMIE and by also
13   wearing a wedding ring, beginning by 2005. ZIMMIE also wore a wedding ring and
14   they held themselves out to the public as married. In 2010, WARNER in fact provided
15   ZIMMIE with an engagement ring. WARNER additionally asked that he be named
16   the beneficiary of ZIMMIE's Last Will and Testament.

17   11.   Pursuant to and in confirmation of and in reliance upon the said
18   agreement, WARNER and ZIMMIE maintained a "marriage-like" relationship from
19   approximately 2000 to 2020.

20   12.   Throughout this time, ZIMMIE and WARNER created a familial
21   relationship and treated each other's family as their own. For example, WARNER
22   purchased a home for ZIMMIE's daughter. WARNER also took ZIMMIE's daughter
23   and granddaughter with them on vacations to Mexico, Connecticut and Disneyworld.
24   WARNER often drove ZIMMIE's daughter to school and, in fact, taught ZIMMIE's
25   daughter how to drive.

26   13.   During the parties' relationship, WARNER and ZIMMIE enjoyed an
27   elaborate standard of living travelling domestically and internationally to destinations
28   around the globe including Asia, Chicago, Germany, Morocco, Europe, Italy,

England, California, New York.  It was during the period of time of their relationship from 1998 to 2020 that WARNER started and grew his property business with acquisitions of the Four Seasons Biltmore, the Four Seasons in New York, San Ysidro Rancho, Las Ventanas al Paraiso, Sandpiper Golf Course, Coral Casino in Santa Barbara, Montecito Country Club.  In fact, WARNER made the San Ysidro Ranch redecoration ZIMMIE's project - for which she received two prestigious awards for its décor.

14.     Throughout the parties' relationship, the agreement between WARNER and ZIMMIE was reaffirmed and ratified by the parities both verbally and by their conduct.

15.     Pursuant to WARNER's promise to ZIMMIE, WARNER did in fact pay for all their living expenses.  WARNER paid for all ZIMMIE's expenses and needs until she left him in November 2020 due to fear for her safety and well-being.

16.     In reliance on WARNER's promises that she would always be taken care of, ZIMMIE devoted every hour of her life for seven days per week, for decades, fostering her relationship with WARNER and supporting WARNER, both professionally and personally.  She travelled the world with him, attending trade shows and conferences, accompanying WARNER on business trips and inspections of manufacturing plants, creating designs for his companies, decorating his San Ysidro Ranch on two separate occasions, decorating other of WARNER's hotels, creating artwork for WARNER's businesses, creating artwork for WARNER's personal use, decorating their aforementioned home in Montecito, creating advertisements for his properties, and designing menus at his restaurants.

17.     Throughout the parties' relationship, in further reliance on WARNER's promises, ZIMMIE passed up various career opportunities that would have benefitted her and provided financial stability.  Instead, ZIMMIE spent seven days a week

working and living with WARNER.   In turn, WARNER always promised to financially provide for her for the rest of her life.

18.     ZIMMIE has at all times performed each and every covenant and condition to be performed by her for the benefit of the parties.

19.     During the time ZIMMIE and WARNER maintained their relationship, WARNER acquired substantial personal, business and real property holdings as discussed above.

20.     The above referenced services that ZIMMIE performed for WARNER and the contribution of ZIMMIE's skills, expertise, efforts and labor - pursuant to the terms of said agreement - were mutually bargained for by the parties and are adequate consideration for the providing to ZIMMIE of promised interests in financial, personal, real property and other business interests, to render ZIMMIE financially secure and that said agreement was and is just, fair, reasonable and equitable in all respects.

21.     WARNER has failed to honor his promises to ZIMMIE.   Counsel for ZIMMIE reached out to counsel for WARNER to discuss a resolution of the anticipated legal claims in January 2021.   In response, Counsel for ZIMMIE was notified by counsel for WARNER that he demanded the return of her mobile devices, computers, tablets and the like that he allegedly purchased.  He also advised that he was cancelling a supposed "contract" with an alleged entity that WARNER created and referred to as ZIMMIE's business which was apparently being paid $200,000 annually since 2018.  ZIMMIE returned the items but to this day is unaware of any business nor did she personally receive any compensation from WARNER.  Rather, she is now left, at age eighty-five (85) with debt on a credit card and an overdue tax bill.

22.     By reason of the refusal by WARNER to honor said oral agreement as set forth herein above, WARNER has breached said agreement.

SECOND AMENDED COMPLAINT

23.   As a proximate cause of said breach of contract, ZIMMIE has been damaged in an amount in excess of the jurisdictional limits of this Court.

24.   WARNER should be further estopped to raise any section of the Statute of Frauds as his actions and representations caused ZIMMIE to detrimentally rely on their agreement and that WARNER, in turn, would be unconscionably and unjustly enriched.

## SECOND CAUSE OF ACTION

(For Damages Based on Breach of Implied in Fact Contract)

25.   Plaintiff incorporates paragraphs 1 through 24, inclusive of this Complaint as though fully set forth herein.

26.   During the entirety of their relationships, as part of an implied agreement with WARNER at said time and continuing thereafter, ZIMMIE gave up her goals and career opportunities which would have benefitted her.  As part of said implied agreement, ZIMMIE devoted her skills, efforts, expertise and labor in furtherance of the agreement entered into between the parties and in maintaining ZIMMIE and WARNER's relationship wherein ZIMMIE acted as WARNER's companion, protector, confidante, and helpmate thereby satisfying all of WARNER's personal needs.

27.   WARNER understood that ZIMMIE was contributing her skills, efforts, expertise and labor to WARNER and that WARNER would treat ZIMMIE fairly for the rest of her life.

28.   WARNER manifested his assent to the conditions on which ZIMMIE performed, expended and contributed her skills, efforts, expertise and labor as herein described, by accepting her skills, efforts, expertise and labor and treating her skills, efforts, expertise and labor as property of both ZIMMIE and WARNER.

29.   During the course of time that ZIMMIE and WARNER maintained their relationship, said parties conducted their relationship in a manner and with similar

force and effect as would a married couple and in doing so, dealt with each other in a fair and trusting manner, thereby creating in both ZIMMIE and WARNER a reasonable expectation between the parties as follows:

    a. At WARNER's request, ZIMMIE gave up various goals and opportunities which would have benefitted her in the future so that she would be able to devote all of her time and attention to WARNER's personal and professional needs, with the continued assurance that she would then and in the future, in the case of the termination of their relationship, obtain a fair and equitable division of the parties' assets and that she would be rendered financially secure for the remainder of her life;

    b. ZIMMIE acted as a partner, companion, protector, helpmate and confidante to WARNER;

    c. ZIMMIE devoted most aspects of her life to WARNER's needs, interests and well being to the exclusion of her own, making herself available to WARNER at all times;

    d. Throughout the period of time the parties' maintained their relationship, WARNER assured ZIMMIE that she would always be taken care of and would be rendered financially secure; and

    e. ZIMMIE enjoyed and maintained, during the course of the parties' relationship, a certain standard of living, which standard of living WARNER promised to maintain or exceed for ZIMMIE.

30.    ZIMMIE devoted her time and attention to WARNER's personal needs with continued assurance during the course of the parties' relationship that she would be rendered financially secure.

31.    In November 2020, ZIMMIE left WARNER for fear of her safety and well-being.  In January of 2021, WARNER breached the agreement by refusing to

resolve this dispute and then cutting off all benefits to ZIMMIE.  WARNER remains in breach of the agreement existing between the parties.

32.     ZIMMIE has at all times performed each and every covenant and condition by her to be performed and rendered services and contributing her skills, efforts, expertise and labor as required by the terms of the agreement between the parties.

33.     The above referenced services that ZIMMIE performed for WARNER and the contribution of ZIMMIE's skills, efforts and labor under and pursuant to said agreement, were, and are, adequate consideration for the providing of the promised division of real and personal property holdings upon separation and the rendering of ZIMMIE as financially secure.  Said agreement was and is fair, reasonable and equitable in all respects.

34.     As a proximate cause of said breach of the implied in fact contract, ZIMMIE has been damaged in an amount in excess of the jurisdictional limits of this Court.

## THIRD CAUSE OF ACTION

(Quiet Title)

35.     Plaintiff incorporates Paragraph 1 through 34, inclusive of this Complaint as though fully set forth herein.

36.     ZIMMIE, at all times herein mentioned, was the owner of an undivided one-half interest in the property located at 1000 Channel Drive, Santa Barbara, CA 93108.

37.     ZIMMIE, at all times herein mentioned, was, and is, entitled to possession and control of the above-described real property.

38.     The legal description of the property at issue located at 1000 Channel Drive, Santa Barbara CA 93108 is identified in the March 24, 2004 Grant Deed, fully executed by Defendant WARNER and attached hereto in its entirety as Exhibit A.

39.     The above-referenced property was purchased by WARNER for which he expressly stated and represented to ZIMMIE that the aforementioned property was their home together.

40.     The property at issue was transferred by WARNER from his company, HTW, LLC to Defendant FAIRWAY on March 24, 2004. Please see Exhibit A for a detailed legal description in the attached Grant Deed.

41.     Defendant FAIRWAY is a Limited Liability Delaware Corporation recognized within the State of California at Secretary of State File Number 200407810198. A complete copy of this California Corporation Information is attached hereto as Exhibit B.

42.     As evidenced by Exhibit 2, Defendant WARNER is Chief Executive Officer, Sole Member, and Sole Manager of Defendant FAIRWAY.

43.     Defendant FAIRWAY was formed on February 24, 2004 as a Real Estate Investment Business. See Exhibit B.

44.     The basis of ZIMMIE's claim to title is that during the course of their relationships, ZIMMIE and WARNER entered into an oral and/or implied in fact agreement(s) wherein ZIMMIE agreed to act as WARNER's companion, protector, confidante, advisor and helpmate.  In exchange, WARNER promised to provide a home for ZIMMIE and render ZIMMIE financially secure for the rest of her life.

45.     Beginning around 2000, WARNER purchased the 1000 Channel Drive, Santa Barbara, CA 93108 property for both himself and ZIMMIE.  From thereon after, the parties considered themselves to be equal owners of the aforementioned property, regardless of how title was held.  To wit, there was an entire wing designed for, and used exclusively by, ZIMMIE as her art studio. All her paints, supplies, and a few pieces she was working on remain there to this day, along with her clothes and personal belongings.  Further, ZIMMIE and WARNER travelled the world together, gathering unique and expensive artwork for the home. ZIMMIE furnished and decorated the home.

46.   ZIMMIE is informed and believes and thereon alleges that WARNER claims an interest in the above-described real property adverse to ZIMMIE's.

47.   As identified previously, and as evidenced at Exhibits A and B, Defendant WARNER is the sole owner, possessor, and interested party in control of the property at issue as described in the Grant Deed at Exhibit A, which is currently in name only to Defendant FAIRWAY,

48.   WARNER owns the property at issue through Defendant FAIRWAY, which holds the deed to the property at issue and is wholly owned and operated by Defendant WARNER.

49.   The valid oral and/or implied in fact agreement(s) which exist between Defendant WARNER and Plaintiff ZIMMIE related to the ownership of the property is not subject to the California Statute of Frauds for the following reasons:

    a.   The basis of ownership interest in the property is based on a valid agreement between the PARTIES;

    b.   California recognizes palimony, which is based on agreements between partners, including the PARTIES in this matter; and,

    c.   Statute of Frauds does not apply given that the claims at issue in this matter does not involve a claim of transfer in land, but rather seeks an ownership interest in property promised to Plaintiff ZIMMIE through a valid agreement(s) between the PARTIES.

50.   ZIMMIE is seeking to quiet title against the claim of WARNER as follows based on her shared interest in the property at issue:

    a.   ZIMMIE and WARNER entered into a valid agreement(s) wherein ZIMMIE agreed to act as WARNER's companion, confidante and act as helpmate and partner and that she would support him emotionally in both his personal and professional life.  WARNER promised to ZIMMIE that he would always provide for her and financially support ZIMMIE for the rest of her life; and

b. As a result of the parties' aforementioned agreement, ZIMMIE and WARNER each have an undivided one-half ownership interest in the aforementioned property.

51.    ZIMMIE seeks to quiet title of the aforementioned property as of WARNER's date of purchase of the property, and for clarification, Plaintiff ZIMMIE is asserting these claims against Defendant WARNER individually, and against WARNER and FAIRWAY based on the WARNER's sole managing and controlling interest of the FAIRWAY company.

**FOURTH CAUSE OF ACTION**

(Intentional Infliction of Emotional Distress)

52.    Plaintiff incorporates Paragraph 1 through 51, inclusive of this Complaint as though fully set forth herein.

53.    In 2012, at a bathroom in the Four Seasons New York hotel owned by WARNER, ZIMMIE announced that she was leaving WARNER.  WARNER placed his hand around ZIMMIE's throat and stated "I wouldn't do that if I were you." WARNER had squeezed ZIMMIE's throat so hard that she realized that her life was in in danger if she ever left him.

54.    Continuing after the date of this incident, WARNER's continued controlling conduct caused her to suffer severe emotional distress.  For example, on one occasion, ZIMMIE had an ankle injury which caused her to be unstable on her feet and eventually led to her requiring the use of a cane to assist with her mobility. WARNER would constantly berate her, in public, need to require a cane or need assistance stating the "ground was flat" and "You're fine."  The verbal and demonstrable abuse became more outrageous in 2019 and 2020 when WARNER would physically hide ZIMMIE's cane so that she would not use it.  When ZIMMIE could not locate the cane, she would hold onto things to keep her stable around their Montecito home and WARNER would exclaim to her "why are you hanging onto things?  You look ridiculous."

55.    WARNER's conduct was continually verbally and emotionally abusive over the course of their relationship.  She was never allowed to leave his side for the last 20 years.  When she would leave the room they were in together, WARNER would immediately start yelling for her "Katie, Katie, Katie!"  WARNER, by example, would often be rude and loud when ZIMMIE did not finish a meal stating to ZIMMIE "why can't you finish that!  It costs money!"  Even if she coughed, WARNER would tell her that he was irritated and would yell at ZIMMIE to "go to the hospital as I can't stand that coughing!"

56.    When ZIMMIE tried to leave the first time in November of 2020 WARNER saw her suitcases by the door and stated "nobody is going anywhere." ZIMMIE retreated to her room and WARNER accused her of "upsetting everyone like that."

57.    ZIMMIE was watched 24/7 by WARNER with the cameras everywhere in their homes and businesses.  ZIMMIE was fearful of her well-being and confided in a friend to keep searching for her if she ever turned up missing.

58.    WARNER's statements and actions intended to cause ZIMMIE's emotional distress and WARNER acted with reckless disregard that his actions would cause ZIMMIE emotional distress.

59.    ZIMMIE did in fact suffer severe emotional distress.

60.    WARNER's conduct was a substantial factor in causing ZIMMIE's severe emotional distress and as a result she has been damaged in an amount in excess of the jurisdictional limits of this Court.

## FIFTH CAUSE OF ACTION

(Negligent Infliction of Emotional Distress)

61.    Plaintiff incorporates Paragraph 1 through 60, inclusive of this Complaint as though fully set forth herein.

62.    WARNER owed a duty of care at all times to ZIMMIE during the course of their agreement and relationship.

63.     WARNER negligent acted and breached that duty of care to ZIMMIE in 2012 at a bathroom in the Four Seasons New York hotel owned by WARNER, ZIMMIE announced that was leaving WARNER after another one of his broken promises.  WARNER then proceeded to put his hands around ZIMMIE's throat and stated "I wouldn't do that if I were you."  He had squeezed her throat so hard that she realized that her life was in in danger if she ever left her.

64.     Continuing after the date of this incident, ZIMMIE claims that WARNER's continued conduct caused her to suffer severe emotional distress.

65.     ZIMMIE had an ankle injury which caused her to be unstable on her feet and eventually led to her requiring the use of a cane to assist with her mobility. WARNER would constantly berate her need to require a cane or need assistance stating the "ground was flat" and "You're fine."  The verbal and demonstrable abuse became more outrageous in 2019 and 2020 when WARNER would physically hide ZIMMIE's cane so that she would not use it.  When ZIMMIE could not locate the cane, she would hold onto things to keep her stable around their Montecito home and WARNER would exclaim to her "why are you hanging onto things?  You look ridiculous."

66.     WARNER's conduct was continually verbally abusive over the course of their relationship.  She was never allowed to leave his side for the last 20 years. When she would leave the room they were in together, WARNER would immediately start yelling for her "Katie, Katie, Katie!"

67.     When ZIMMIE tried to leave the first time in November of 2020, WARNER saw her suitcases by the door and stated "nobody is going anywhere." ZIMMIE retreated to her room and WARNER accused her of "upsetting everyone like that."

68.     ZIMMIE was watched 24/7 by WARNER with the cameras everywhere in their homes and businesses.  ZIMMIE was fearful of her well-being and confided in a friend to keep searching for her if she ever turned up missing.

69.     WARNER, by example, would often be rude and loud when ZIMMIE did not finish a meal stating to ZIMMIE "why can't you finish that!  It costs money!"

70.     Even if she coughed, WARNER would tell her that he was irritated and would yell at ZIMMIE to "go to the hospital as I can't stand that coughing!"

71.     WARNER overt statements intended to cause ZIMMIE's emotional distress and WARNER acted with reckless disregard that his actions would cause ZIMMIE emotional distress.

72.     ZIMMIE did in fact suffer severe emotional distress.  This is proven by the fact that she fled fearing for her well-being in November 2020.

73.     WARNER's negligence was a substantial factor in causing ZIMMIE's serious emotional distress.

74.     ZIMMIE has been harmed in that she suffers from anguish, fright, horror, anxiety, nervousness, worry and shame and has been damaged in an amount in excess of the jurisdictional limits of this Court.

## SIXTH CAUSE OF ACTION

(Conversion)

75.     Plaintiff incorporates Paragraph 1 through 74, inclusive of this Complaint as though fully set forth herein.

76.     ZIMMIE is an accomplished artist and has created many pieces of artwork.  WARNER loved her paintings and took them from her to decorate their Montecito home and his many properties and businesses.

77.     ZIMMIE believed that WARNER's intentions were to create a trusting and loving relationship for which ZIMMIE would continue to be taken care of for the rest of her life as was promised by WARNER.

78.     The paintings range from two foot by four foot to five foot by six foot and are mixed media on canvas and are best described as abstract expressionistic similar to those of artist Helen Frankenthaler.

79.     Two large original paintings are in WARNER's personal office at Ty, Inc.

80.     Twenty-six original paintings are in the aforementioned home in Santa Barbara.

81.     Seven original paintings are in the New York Four Seasons hotel.

82.     Twenty reproductions are in the Montecito Country Club.

83.     Two original paintings are in the Biltmore Santa Barbara hotel.

84.     Additionally, WARNER continues to use ZIMMIE's drawings for advertisements in the Montecito Journal for the San Ysidro Ranch.

85.     Further, ZIMMIE created designs and logos for many Beanie Baby paraphernalia sold by WARNER.

86.     Moreover, ZIMMIE redrew approximately 150 Beanie Baby designs, for use that was licensed by WARNER and sold in various types of products including T-shirts, children's clothing and towels to name a few of the items.

87.     WARNER substantially interfered with ZIMMIE's artwork by knowingly or intentionally refusing to return the artwork to ZIMMIE despite her requests to return the same.

88.     ZIMMIE did not consent to the taking of the artwork after their relationship ended.

89.     ZIMMIE has suffered harm by the loss of value of the artwork while WARNER continues to profit from the same at his properties.

90.     WARNER's conduct was a substantial factor in causing ZIMMIE's harm for which she has suffered damages in excess of the jurisdictional limits of this Court.

## SEVENTH CAUSE OF ACTION

### (Fraud/Civil RICO)

91.     Plaintiff incorporates Paragraph 1 through 90, inclusive of this Complaint as though fully set forth herein.

92.     Defendant WARNER and individuals who assisted him in his financial and legal affairs, participated in criminal conduct with actual knowledge of the illegal activities.

93.     Defendant WARNER, and individuals who assisted him in his financial and legal affairs. participated in a pattern of racketeering activity.

94.     Defendant WARNER and individuals who assisted him in his financial and legal affairs comprised an enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4), that is, the Enterprise constituted a group of individuals associated in fact that were engaged in, and the activities of which affected, interstate commerce.

95.     The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

96.     The purposes of the Enterprise were to provide tax benefits to Defendant WARNER, to deceive and defraud Plaintiff ZIMMIE, and to perpetuate WARNER's relationship with ZIMMIE by convincing her that she was properly compensated and that she would always be financially secure.

97.     The members of the Enterprise expected to receive financial opportunities and personal benefits, including increased power and status within the Enterprise.

98.     In connection with the Enterprise, WARNER and other members of the Enterprise misappropriated ZIMMIE's identity to create a fictitious legal entity that ZIMMIE knew nothing about.  WARNER funneled funds through this fictitious entity to deceive ZIMMIE and others.

99.     The Enterprise operated within the State of California and across interstate boarders.

100.    ZIMMIE brings this private civil claim pursuant to 18 U.S.C. Section 1964 against WARNER as she has been injured as a direct and proximate result of the Defendants' activities and violations of 18 U.S.C. § 1962.

101.    On or about January 2018, The Enterprise created a company using the name of ZIMMIE and named it Cleveland Design Consultants, LLC, without her knowledge.

102.    This purported legal entity was formed by Defendant WARNER'S legal counsel along with his financial advisors.

103.    This business was created without executed signatures by Plaintiff ZIMMIE on either the LLC Agreement nor the Resolution Agreement.

104.    Moreover, additional documents, including a Power of Attorney that purported to assign ZIMMIE's decision making to a member of The Enterprise was not signed by Plaintiff ZIMMIE and appear to contain an inauthentic signature.

105.    Upon information and belief, WARNER, and those associated with him, funneled money into and through Cleveland Design Consultants, LLC – wiring funds into the account on numerous occasions.

106.    Without Plaintiff ZIMMIE'S knowledge, these funds were then transferred from the LLC account into other accounts at the direction of WARNER or other members of The Enterprise.

107.    Defendant WARNER and The Enterprise shared in a plan to defraud ZIMMIE from money that now they refer to as a salary, they had an intent to defraud her for her services to WARNER and his business, they also were area that the money would pass from WARNER and his business to some unknown location controlled by WARNER and The Enterprise.

108.    This behavior exhibited by Defendant WARNER is not unusual as Defendant is a convicted felon. In 2014, he was convicted of tax evasion for creating a secret offshore account.

109.    Defendant WARNER, his advisors and associates, and The Enterprise's, activities constitute violations of 18 U.S.C. § 1962 demonstrating a pattern of deceit conducted over a number of years.   Specifically, WARNER wired funds to the

Cleveland Design Consultants, LLC perpetually from 2018 to 2020 on more than 50 occasions.

110.    ZIMMIE suffered harm through identity theft and wire fraud for which she was recently informed by the Delaware Secretary of State that she is delinquent on paying of overdue taxes on the Cleveland Design Consultants, LLC business.

111.    Further, WARNER is now utilizing The Enterprises' wrongdoing as 'evidence' that should be used to defeat Zimmie's civil claims against him.

112.    ZIMMIE was further damaged personally in that she did not even receive the purported benefited of the $200,000 per annum that the fictitious agreement allegedly entitled her to for her design services from January 2018 to November, 2020.  For the avoidance of any doubt, ZIMMIE in no manner concedes that is the extent of her value of services.

113.    WARNER's criminal conduct was a substantial factor in causing ZIMMIE's harm including her identity theft and failure to be compensated per an alleged contract which WARNER alleges exists for which she has suffered damages in excess of the jurisdictional limits of this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, ZIMMIE prays for judgment as follows:

(1)    For damages according to proof at the time of trial, including, but not limited to actual financial damages, lost wages, pain & suffering, compensatory damages, damages related to WARNER's unjust enrichment, quantum meruit, treble and punitive damages.

(2)    For costs of suit incurred herein including attorney's fees, to the extent permitted by law.

(3)    For quiet title to an interest in real property, and judgment ordering that ZIMMIE owns an undivided one-half interest in the property located at 1000 Channel Drive, Santa Barbara, CA 93108 as described in Exhibit

1, currently owned by Defendant FAIRWAY, or in the alternative, one-half of the fair market value of the property at the time of judgment;

(4)   To enjoin WARNER from utilizing ZIMMIE's paintings, drawings and intellectual property and to return all of ZIMMIE's artwork to ZIMMIE.

(5)   To send this matter to the appropriate authorities for a criminal investigation of WARNER and his legal and financial advisors.

(6)   For such other and further relief as the Court may deem just and proper.

Dated: November 19, 2021

/s/ William T. Gibbs
William T. Gibbs
CORBOY & DEMETRIO, P.C.
Attorneys for Plaintiff
33 North Dearborn Street, 21st Floor
Chicago, Illinois 60602
(312) 346-3191
wtg@corboydemetrio.com
*Admitted Pro Hac Vice*

/s/ Robert M. Cohen
Robert M. Cohen (SBN 40134)
LAW OFFICES OF ROBERT M. COHEN
Attorney for Plaintiff
301 North Canon Drive, Suite 300
Beverly Hills, California 90210
(310) 277-1127
office@bobcohenesq.com

/s/ Jason R. Lukasevic
Jason E. Lukasevic
GOLDBERG PERSKY WHITE P.C.
Attorney for Plaintiff
11 Stanwix Street, Suite 1800
Pittsburgh, PA 15222
(412) 471-3980
jluckasevic@gpwlaw.com
*Admitted Pro Hac Vice*

LAW OFFICES<br>
ROBERT M. COHEN<br>
301 NorthCanon Drive, Suite 300<br>
Beverly Hills, California 90210<br>
(310) 277-1127

**VERIFICATION**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

      I have read the foregoing document and know its contents.

      I am a party to this action.  The matters stated in the foregoing PLAINTIFF'S SECOND AMENDED COMPLAINT, BREACH OF EXPRESS CONTRACT; BREACH OF IMPLIED CONTRACT, QUIET TITLE, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS, CONVERSION, FRAUD/CIVIL RICO are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

      Executed on 11/17, 2021, at Hollw, California.

KATHRYN ZIMMIE

**<u>Certificate of Service</u>**

On November 19, 2021, I electronically filed a copy of the foregoing document through the CM/ECF system for the United States District Court for the Central  District of California, which will send a notice of electronic filing to all counsel of record and make it available for viewing and downloading from the CM/ECF system.


     /s/ William T. Gibbs

William T. Gibbs
Corboy & Demetrio, P.C.
33 North Dearborn Street, 21st Floor
Attorneys for Plaintiff
Chicago, Illinois  60602
(312) 346-3191
wtg@corboydemetrio.com
*Admitted Pro Hac Vice*